```
 1        IN THE UNITED STATES DISTRICT COURT

 2           MIDDLE DISTRICT OF ALABAMA

 3              NORTHERN DIVISION

 4

 5   CIVIL ACTION NUMBER

 6   2:06CV268-D

 7

 8   MITCHELL BRACKNELL,

 9        Plaintiff(s),

10   vs.

11   CITY OF MONTGOMERY and

12   OFFICER DON FAVOR,

13        Defendant(s).

14

15

16

17           DEPOSITION TESTIMONY OF:

18              OFFICER DON FAVOR

19

20

21   November 21, 2006

22   9:04 AM

23   SELAH M. DRYER, CSR
```

**1**

```
1        IN THE UNITED STATES DISTRICT COURT
2           MIDDLE DISTRICT OF ALABAMA
3                NORTHERN DIVISION
4
5  CIVIL ACTION NUMBER
6  2:06CV268-D
7
8  MITCHELL BRACKNELL,
9       Plaintiff(s),
10 vs.
11 CITY OF MONTGOMERY and
12 OFFICER DON FAVOR,
13      Defendant(s).
14
15
16
17           DEPOSITION TESTIMONY OF:
18              OFFICER DON FAVOR
19
20
21 November 21, 2006
22 9:04 AM
23 SELAH M. DRYER, CSR
```

**2**

```
1              S T I P U L A T I O N
2       IT IS STIPULATED AND AGREED by and
3  between the parties through their
4  respective counsel that the deposition of
5  OFFICER DON FAVOR, may be taken before
6  Selah M. Dryer, Notary Public, State at
7  Large, at the Montgomery County Law
8  Library, 251 S. Lawrence Street,
9  Montgomery, Alabama  36104, on November
10 21, 2006, commencing at approximately 9:04
11 AM.
12       IT IS FURTHER STIPULATED AND
13 AGREED that the signature to and the
14 reading of the deposition by the witness
15 is waived, the deposition to have the same
16 force and effect as if full compliance had
17 been had with all laws and rules of Court
18 relating to the taking of depositions.
19       IT IS FURTHER STIPULATED AND
20 AGREED that it shall not be necessary for
21 any objections to be made by counsel to
22 any questions, except as to form or
23 leading questions, and that counsel for
```

**3**

```
1  the parties may make objections and assign
2  grounds at the time of trial or at the
3  time said deposition is offered in
4  evidence, or prior thereto.
5       In accordance with Rule
6  5(d) of the Alabama Rules of Civil
7  Procedure, as amended, effective May 15,
8  1988, I, Selah M. Dryer, am hereby
9  delivering to J. Scott Hooper, Esq. the
10 original transcript of the oral testimony
11 taken November 21, 2006, along with
12 exhibits.
13       Please be advised that this is the
14 same and not retained by the Court
15 Reporter, nor filed with the Court.
16
17
18
19
20
21
22
23
```

**4**

```
1                 I N D E X
2  EXAMINATION BY:              PAGE NO.
3  Mr. Hooper                       7
4  Mr. Mills                       78
5  Mr. Hooper                      85
6  Certificate                     93
7
8            INDEX OF EXHIBITS
9  EXHIBITS                    PAGE NO.
10 PLAINTIFF(S) 1                  61
11 PLAINTIFF(S) 2                  63
12 PLAINTIFF(S) 3                  67
13
14
15
16
17
18
19
20
21
22
23
```

5

A P P E A R A N C E S

FOR THE PLAINTIFF(S):

   J. Scott Hooper, Esq.

   THE HOOPER LAW FIRM, PC

   4220 Carmichael Court North

   Montgomery, Alabama 36106

FOR THE DEFENDANT(S):

   Wallace D. Mills, Esq.

   CITY OF MONTGOMERY

   Legal Department

   103 N. Perry Street

   Suite 200

   Montgomery, Alabama 36104

ALSO PRESENT:

   Officer Don Favor

6

     I, Selah M. Dryer, a Notary Public
for the State of Alabama at Large, acting
as Commissioner, certify that on this
date, pursuant to the Alabama Rules of
Civil Procedure, and the foregoing
stipulation of counsel, there came before
me at the Montgomery County Law Library,
251 S. Lawrence Street, Montgomery,
Alabama 36104, commencing at
approximately 9:04 AM on November 21,
2006, OFFICER DON FAVOR, witness in the
above cause, for oral examination,
whereupon the following proceedings were
had:

          OFFICER DON FAVOR,
being first duly sworn, was examined and
testified as follows:

         COURT REPORTER:  Usual
stipulations?

         MR. MILLS:  That's fine
with me.

         MR. HOOPER:  Yes.

7

EXAMINATION BY MR. HOOPER:

    Q.   Would you state your name for
the record, please.

    A.   Sergeant WD Favor, F-A-V-O-R.

    Q.   Mr. Favor, what's your
educational background?

    A.   High school education along
with continuing education through the
Montgomery Police Department and the
academy, no violations.

    Q.   Where did you finish high
school?

    A.   Robert E. Lee High School.

    Q.   How long have you lived in
Montgomery?

    A.   Most all of my life.

    Q.   What was your employment
immediately after high school?

    A.   I was in automobile business
with the dealerships, working wholesale
body parts and stuff like that.

    Q.   What company was that with?

    A.   I started with Haigler Auto

8

Parts and then Capitol Motor Company and
then Riverside Chevrolet and Jack Ingrum.

    Q.   How long did you do that?

    A.   About 10 years.

    Q.   That would have brought you up
to about, what, 28, 29?

    A.   Started the academy at 28.

    Q.   Montgomery Police Academy?

    A.   Yes.

    Q.   How long have you been a
police officer?

    A.   Since 1994.

    Q.   And that was all with the
Montgomery Police Department?

    A.   That's correct.

    Q.   Are you married?

    A.   Yes.

    Q.   Who is your wife?

    A.   Is that important to this
deposition?  You know, in front of
subjects that have been arrested and such
like that, is that something we need to --

         MR. MILLS:  Scotty, why

9

1  don't you ask him last names of any family
2  people.
3              MR. HOOPER:  I'll just --
4  we will skip a name for now.
5      Q.   (Mr. Hooper)  I agree with
6  you, it might not be totally relevant.
7      Are you currently married?
8      A.   I'm currently married, yes.
9      Q.   Is that your first marriage?
10     A.   Second marriage.
11     Q.   Second.  When did you get
12 married for this marriage, just when,
13 approximately how long ago?
14     A.   29th of August, three years
15 ago.
16     Q.   That would have been '03?
17     A.   I believe that's correct.
18     Q.   Had you previously been
19 married?
20     A.   Yes.
21     Q.   When did that marriage begin
22 and when did it terminate?
23     A.   I was married in '86 and it

10

1  lasted 12 and a half years.  I don't
2  remember the exact date.
3      Q.   So about '99?
4      A.   Somewhere abouts.
5      Q.   Let's see, you said you began
6  the Police Academy during '94.
7      A.   February of '94.
8      Q.   So you went to the Police
9  Academy after you were first married?
10     A.   While I was first married,
11 yes.
12     Q.   Let's go into some
13 background.
14     How long did the Police Academy
15 last?
16     A.   Approximately six months.  I
17 think graduation is in September -- began
18 in February and graduated in September
19 about 18, 20 weeks.
20     Q.   What topics do you cover in
21 the Police Academy as far as classroom
22 stuff?  What all criteria do you go
23 through?

11

1      A.   It's all post requirements and
2  above post, probably some classes are
3  above post.  It's just normal procedures
4  training.
5      Q.   What do you mean by post or
6  above post?
7      A.   Post is a state certification
8  bureau that certifies all of the police
9  officers in the State of Alabama.  They
10 have certain requirements and then the
11 City goes above them for the people that
12 work here in the city, as a police officer
13 in the city.  They also have a minimum
14 standards class that they teach at the
15 academy for outside agencies that's
16 shorter.
17     Q.   Is Montgomery Police Academy
18 deemed to be one of the best in the state?
19     A.   I believe so, yes.
20     Q.   Do you have a lot of current
21 police officers of other jurisdictions who
22 come here for upgrade training?
23     A.   Yes.

12

1      Q.   And recertification things?
2      A.   Yes, sir.
3      Q.   In the training I suppose
4  there is a background in use of weapons in
5  the nature of use of deadly force?
6      A.   Yes.
7      Q.   And that's in the academy
8  itself?
9      A.   That's in the academy itself.
10     Q.   And then I believe with the
11 continuing education that's one of the
12 main topics.  Is that one of the main
13 topics covered in continuing education?
14     A.   As in use of deadly force, it
15 is covered, yes.  You have different
16 classes over the period of years that you
17 go back to and refreshers and advance
18 training and such like that.
19     Q.   Let's spring ahead to the
20 event that we are here about.  I believe
21 it was February 25th of '06, did you
22 receive a call of any nature directing or
23 a request for help in Chisholm?

13

1    A.   I hate to refer to this, but
2  I'm not really sure.  I know it was in
3  February, but I can't remember the exact
4  date.  So if it's the date that I shot
5  your client, then yes, I did.
6    Q.   Okay.
7         MR. HOOPER:  You want to
8  stipulate that's February 25th.
9         MR. MILLS:  Sure.  Did you
10  say February 25th.
11        MR. HOOPER:  That's what
12  it says.
13        MR. MILLS:  That's right.
14  That's what I understand it to be.
15    A.   I just hadn't looked at my
16  paperwork from that.
17    Q.   (Mr. Hooper)  February of 25th
18  of '06.
19    A.   That's correct.
20    Q.   What do you recall about that
21  night?
22    A.   I received a call, or a call
23  went out to an address on Chisholm Street

14

1  of a domestic nature, a female whispering
2  on the phone and I responded.
3    Q.   That's what your dispatcher
4  told you?
5    A.   It came out as a 10-U, 10
6  means 10-uniform, an unknown call that a
7  female whispering on the phone and -- it
8  came up -- on the computer it came up that
9  it had been a domestic there before.
10    Q.   Is that something that's kind
11  of flagged, like a recurring event.
12    A.   Yes.  It says
13  stabbing/cutting, and it gave that address
14  and Mitchell Bracknell's name.
15    Q.   So were you told that it was a
16  stabbing and a cutting at that address?
17    A.   It came up on my computer.  I
18  asked her and she wasn't able to confirm
19  it before I arrived at the scene.
20    Q.   Well, why was that even put up
21  there, or do you know?
22    A.   I don't know.  It was on the
23  traffic.  That's why I was asking her did

15

1  it happen at the same address before or is
2  it going on right now, and she couldn't
3  advise.  She was still trying to sort
4  through the traffic when I arrived at the
5  scene.
6    Q.   So you didn't really know what
7  was going on over there, is that correct?
8    A.   At the point just from my
9  previous experience in the 13 years I've
10  been a police officer, I figured that it
11  was a domestic between husband and wife or
12  man, woman most likely, or the woman was
13  in distress.  Like I said -- later on I
14  had found out that she dialed 911 with her
15  toes, but she was whispering so they
16  couldn't hear her well.
17    Q.   How did you ascertain that she
18  was dialing the phone with her toes?
19    A.   I was just told by a detective
20  in the hall and I overheard them talking
21  about it.
22    Q.   And you took that to be the
23  truth?

16

1    A.   That's just what I understand.
2    Q.   Likewise the same as the
3  information about the stabbing and
4  cutting, you didn't really know what you
5  were going into, it wasn't confirmed?
6    A.   It wasn't confirmed at that
7  point.  I pulled up at the scene and
8  everything broke loose at that point.
9    Q.   What did you observe when you
10  pulled up at the scene?
11    A.   I was the first to arrive.  I
12  was backing up a unit, who had gotten en
13  route.  I was the supervisor, I got en
14  route to back him up, but I arrived there
15  first because I was at headquarters and
16  Chisholm is not that far away.  As I
17  arrived, an Asian-looking female busted
18  out the front door -- through the front
19  door as I exited my patrol vehicle and
20  yelled that's him, that's him, get him,
21  get him, that's Mitchell Bracknell.  And
22  Mitchell ran out the front door, kind of
23  scrambling on his hands and knees trying

17

1  to catch his balance and ran around the
2  corner of the house running towards the
3  back door. And she was yelling get him,
4  get him, he's going to come back, get him,
5  get him, get him. And that's why I
6  attempted to stop him because I didn't
7  know at that point what I had.
8      Q.   What did you say to him, if
9  anything?
10     A.   Halt, freeze, you know that
11 kind of stuff. It was raining hard and he
12 ran down the backyard to the slope. He
13 slipped and fell and I was catching up
14 with him. He got back up and jumped the
15 back fence and took off across several
16 other fences. And that's when she was
17 running up beside me yelling, don't let
18 him go, he's going to come back, he's
19 going to come back, and such like that.
20     Q.   Are you confident that
21 Mr. Bracknell heard what you were saying
22 to him?
23     A.   I'm confident he heard what I

18

1  was saying. I mean, we were originally
2  maybe 25, 30 feet away from each other
3  until he turned the corner and ran down
4  his backyard.
5      Q.   So what was the weather like
6  at that time?
7      A.   It was blowing rain, real
8  hard.
9      Q.   Was it after dark?
10     A.   It was dark.
11     Q.   Did you observe Mr. Mitchell
12 Bracknell with any weapons at that time?
13     A.   I couldn't tell at that time.
14 He was running from me.
15     Q.   So what about "BB" or
16 Mrs. Bracknell or...
17     A.   Is that her name? I don't
18 know her name.
19     Q.   Okay. I can't even pronounce
20 her name, not that I'm aware of. But it's
21 a Vietnamese name.
22     A.   Is it Laotian or Vietnamese?
23     Q.   Well, it was Asian. Kind of a

19

1  long name. Well, whatever it is, what did
2  you observe? What did you notice about
3  the woman?
4      A.   She was in a very distraught,
5  irate state yelling, screaming.
6      Q.   And you took it that she was
7  talking about Mitchell Bracknell?
8      A.   Yeah. She was screaming his
9  name, not to let him go, he's going to
10 come back and get me, and that kind of
11 stuff.
12     Q.   Have you ever responded to a
13 call at that address before?
14     A.   Not that I recall.
15     Q.   Did she appear to be stabbed
16 or cut herself?
17     A.   Not that I could tell at that
18 time, everything was happening fast. I
19 was running and I didn't even have time to
20 look at her hardly. She was just right
21 up -- when I hit the back fence, I didn't
22 jump the back fence. And she was just
23 right there yelling and screaming and I

20

1  was watching him with my flashlight, which
2  way he was going, and I ran back and got
3  my car and went around.
4      Q.   So other than the call that's
5  put on your computer stabbing and cutting,
6  were you aware of any other violent crime
7  or any -- were you aware of any violent
8  crime that had been committed other than
9  what was shown on your computer?
10     A.   Just a female whispering on
11 the phone and possible domestic.
12     Q.   What did you do at that time?
13     A.   Got back to my vehicle. If
14 you can picture this, if you went and
15 surveyed the area, which I assume you
16 have, Chisholm Street dead-ends into
17 Coliseum Boulevard. I went to Coliseum
18 Boulevard, took a left. Went past --
19 there is a row of townhouses there, went
20 past it slowly looking, looking. I saw a
21 couple of other units in the area kind of
22 swirling trying, you know, going the next
23 street over trying to cut him off, because

21

1  I got on the radio and told them that I
2  was in foot pursuit and which way he was
3  going. And went to Sonic up that far and
4  then got to thinking he probably hadn't
5  made it that far, yet and went back towards
6  where the townhouses were.
7      Q.  So what was the purpose of
8  pursuing him?
9      A.  It's the fact that I didn't
10 know at this point what had happened.  I
11 didn't know if somebody was dead inside.
12 I don't know what we got until we stop him
13 and find out what's going on.
14     Q.  So it was your intent to
15 arrest him?
16     A.  To detain him for
17 investigative detention and to find out
18 what was going on.  And then if there is
19 reason to arrest, we will at that point
20 put him in custody.
21     Q.  So your intent was to detain
22 him?
23     A.  That's correct.

22

1      Q.  What did you do next?
2      A.  Went back to where the
3  apartments are right there or the town
4  homes, parked in the parking lot and got
5  out and searched for him.
6      Q.  How long a period of time had
7  elapsed from when you first arrived and
8  talked to this woman and when you drove up
9  to the Sonic and came back?
10     A.  Three minutes.
11     Q.  What next?
12     A.  Got out of my vehicle, had a
13 rain jacket on, had a police hat on and
14 everything.  I'm assigned to the patrol
15 division at that time, had my flashlight
16 and was searching the bushes in front of
17 the residence there.  And as I came to an
18 alleyway that goes between, there was
19 about -- taking a guess -- 30 feet across
20 that goes to the back part where you drive
21 around to the back of the town homes, I
22 pulled my weapon, officer safety, held it
23 down by my side and I was looking.

23

1      Q.  Was it actually an alleyway,
2  or just a yard between the two buildings?
3      A.  It's whatever you want to call
4  it.  It is grassy area, but it's like an
5  alley that goes between to the back area.
6  It's a separation of the two sets of town
7  homes.
8      Q.  Were these town homes
9  basically just open on the front and the
10 back?
11     A.  That's correct.
12     Q.  So basically the long wall of
13 the side of the residences?
14     A.  Yes.
15     Q.  Could you see all the way
16 through?
17     A.  I could see all the way
18 through until a car part area on the right
19 side.  On the left you had a privacy
20 fence, if I recall correctly, that jutted
21 out about six foot and turned and went
22 back to the back of the walkway back
23 there.

24

1      Q.  What next?
2      A.  As I looked down the alleyway,
3  I was walking down I swung wide.  There is
4  a row of hedges that are about chest-high
5  that are on the left side.  And there is
6  like hedges and a break of a couple of
7  feet or more, then another hedge and a
8  couple of feet back to the fence that
9  jutted out.  And I'm looking down, looking
10 in the back -- I'm not really paying
11 attention to the hedges there.  And as I
12 swing wide and start walking down that
13 alley, something catches out of the corner
14 of my eye and I flash over with my light,
15 at which time I see your client laying
16 behind the bushes where he's up on his
17 arm, like this, and he's looking -- I'm
18 looking at half or more of his face and
19 his chest area, and he appears to have a
20 silver handgun pointed at me.  I see a
21 silver barrel, at which time when I flash
22 over I see that I draw my weapon up and
23 fire and move at the same time.  I moved

25

1  around to the other side of the bush.  And
2  I came up and yelled at him, let me see
3  your hands and he was yelling I don't have
4  a gun at that point.
5      Q.   You were looking for somebody?
6      A.   Yes.
7      Q.   And it may have been likely
8  they would have been up in this area?
9      A.   Correct.  Well, the last time
10 I saw him he was running towards those
11 townhouses, that's where I went back to.
12     Q.   Did you have other police
13 officers in the area to assist you?
14     A.   They were -- like I said, they
15 were moving in the area.  I don't know how
16 close they were at that point.
17     Q.   Did you anticipate confronting
18 who you were pursuing, and you had a good
19 idea it was Mitchell Bracknell?
20     A.   Well, she was yelling Mitchell
21 Bracknell and that's what was written on
22 my MPT or my computer was Mitchell
23 Bracknell, but I don't know him that

26

1  well.  I didn't recognize him or anything
2  when he ran out the door, if that's what
3  you are asking.
4      Q.   What did you know about
5  Mitchell Bracknell when you saw the name?
6      A.   You hear it a lot.  You hear
7  Mitchell and his brothers' names a lot,
8  but the only contact that I've ever had
9  with him was approximately seven, eight
10 years before that when I was in patrol
11 before, before I went to ride with
12 homicide, where he was running from a
13 burglary and I stopped him and he was
14 transported to headquarters for
15 questioning.
16     Q.   Before you walked up through
17 between the two buildings, did you yell
18 any warnings out?
19     A.   No, I wasn't saying a thing.
20 I was trying to ease around, trying to
21 find him.
22     Q.   But up through that corridor
23 between those two buildings, would it have

27

1  been easy for you to just yell come out?
2      A.   Well, I mean I was really
3  thinking he was hiding behind there, or on
4  the other side of that privacy fence or
5  behind in there.  Wasn't expecting him
6  really to be where he was.  It was -- it
7  was -- it was a surprise to me.  And in
8  retrospect I went wide, I should have
9  checked the bushes, there but I just
10 wasn't paying attention to the bushes
11 there.
12     Q.   So when you went wide, did you
13 go wide --
14     A.   In other words like if -- in
15 training it's called slicing the pie, you
16 might say.  As I come around a corner of a
17 building, if I'm coming from -- if I'm
18 walking straight along the side of the
19 building and the building ends on my right
20 side, I would move out away from the wall
21 a little bit and kind of slice the pie,
22 slowly looking down this wall rather than
23 going up and turning right into a gun or

28

1  something.  So I would swing wide and kind
2  of cut that slowly as I come around, so I
3  could see and the person don't have a shot
4  at you as quick.  So that's what I did.
5  And then I continued to swing wide and go
6  down there, but I wasn't really paying
7  attention to my left side.
8      Q.   So when you were slicing the
9  pie, as you call it, you actually moved
10 closer to the bushes?
11     A.   Yes.  That was making me go
12 further to the opposite side of the
13 alleyway, which would be closer towards
14 the bushes.
15     Q.   When you were moving closer to
16 the bushes, was that fence you were
17 talking about on the same side of that
18 opening between the two buildings?
19     A.   I could draw it out.  It's
20 kind of a little tough, if you hadn't been
21 out there very much you probably -- you
22 may not understand what I'm saying.  There
23 is a -- the side -- the alley -- the side

29

1  of the alley where the bushes are, if you
2  follow that line of bushes to the
3  backyard, you would run into a privacy
4  fence that's jutting out from the backyard
5  and the side of the house approximately
6  six feet.  It makes a 90-degree turn and
7  goes back to the rear driveway, so the
8  bushes are along the side of the house,
9  and then you come to a privacy fence.  So
10 he had actually ran up and got behind the
11 bushes.
12      Q.  Where did you anticipate
13 someone would be hiding at that point?
14      A.  At that point I was thinking
15 that he may be behind these town homes, in
16 the yard behind the town homes.  Because
17 where the town homes are, it's about a
18 45-degree angle back to the backyard of
19 the residence that he ran from.  And he
20 was running, jumping fences towards those
21 town homes the last time I had seen him.
22      Q.  So while you were looking for
23 somebody, you didn't give any warning,

30

1  yelling, surrender, come out, hands up,
2  anything?
3      A.  I didn't know he was in there.
4      Q.  But the question is:  While
5  you were pursuing, looking for someone and
6  you felt like you may have been in close
7  proximity to that person, whoever they
8  were, you gave no warning, is that right?
9      A.  Well, if he was behind the
10 houses and I'm in front of the houses and
11 I start yelling come out, come out
12 wherever you are, it's most likely he
13 would probably run a different direction
14 from where I am and I would never see him
15 or find him.
16      Q.  But you gave no warning at
17 that time?
18      A.  There wasn't a time to give a
19 warning.
20      Q.  But you didn't give one
21 anyway, did you?
22      A.  No, because it wasn't a time
23 to give a warning.  It all happened

31

1  just like that.
2      Q.  As it turned out he was closer
3  to you than you anticipated, or someone
4  was?
5      A.  Yes, he was.  Mr. Bracknell
6  was closer to me than I thought.
7      Q.  At that time you didn't know
8  it was Mr. Bracknell?
9      A.  All I had was names given to
10 me off the --
11      Q.  For all you know, it could
12 have been the owner of that residence of
13 the house up in that bush, is that
14 correct?
15      A.  Well, at the time whoever it
16 was had a barrel pointed at me.  And yes,
17 it looked like -- it appeared to be the
18 same person I had been chasing.
19      Q.  But when Mr. Bracknell or
20 whoever it was jumped the fence at the
21 residence that you were calling to and
22 they jumped away, you lost sight of that
23 person?

32

1      A.  Yes.  You got to understand
2  this is a blowing rain, I mean a blowing
3  rain.  The owner would not likely be
4  laying behind a bush on the side of his
5  house waiting on me with a gun.
6      Q.  I'm just trying to understand
7  what we have.  And I understand it was bad
8  weather.
9      A.  Uh-huh.
10      Q.  And you are a highly trained
11 police officer?
12      A.  Yes, I am.
13      Q.  And you were pursuing a
14 person, you were in close proximity to him
15 but you gave no warning before you shot
16 him?
17      A.  No.
18      Q.  Could you see down the wall of
19 the other side of the other -- there is
20 two residences -- you were walking between
21 them, one side has bushes next to it, the
22 other side was barren; is that correct?
23      A.  Correct, what I recall, yes.

33

1   Q.   So instead of walking next to
2   the bare wall, you walk next to the
3   bushes?
4   A.   Well, as I swung wide it gives
5   you a feeling of confidence if you are
6   behind that fence as you are approaching
7   the back of the yard instead of walking
8   out in the middle.  There is not really
9   that much confidence there, but...
10  Q.   Is it fair to say you made a
11  judgment call, anticipating in confronting
12  somebody in the back of the building?
13  A.   Correct.
14  Q.   And so you gave no warning at
15  all?
16  A.   No.
17  Q.   Before I interrupted you, you
18  were saying that you had swung around with
19  your flashlight and you are, obviously,
20  left-handed; is that correct?
21  A.   Correct.
22  Q.   And you made a shot?
23  A.   Correct.

34

1   Q.   Did you take any time to aim,
2   or was it just a quick shot?
3   A.   It was very quick.  I was
4   fading as I fired and moved out of the
5   line of fire, or what I thought would be
6   the line of fire.
7   Q.   What exactly was said by
8   either party, you or by the other party at
9   that time?
10  A.   At that time Mitchell yelled
11  out I don't have a gun, I don't have a
12  gun.  And at that point it sounded like he
13  was telling the truth.  And I was like,
14  let me see your hands, let me see your
15  hands.  You could hear the desperation in
16  his voice.  I've interviewed hundreds of
17  people and he didn't sound like he was
18  lying.  And I said, let me see your hands
19  and then he scooted back behind the bush
20  he scooted because I had went around the
21  other side.  He scooted out towards me and
22  sat up and said why did you shoot me?
23  Q.   What was said by either party

35

1   at that time, you or him?
2   A.   I told him to let me see your
3   hands.  He showed me his hands.  At that
4   point a large blood spot came up on his
5   chest right here.  And I approached him
6   and I got him by his arm and I said walk
7   out, walk out and he got on his knees and
8   kind of half-stood and walked, got him in
9   front of the bushes, I sat him down on his
10  butt, laid him back.  At that time I told
11  him to stay there and I walked backwards
12  until I could see the numbers of the front
13  of the residence.  I called it in, walked
14  back up to him.
15  Q.   Is that everything that was
16  said up to that point by either of you?
17  A.   As much as I recall.
18  Q.   You had just backed up to
19  where you could see the numbers on the --
20  A.   On the front of the residence.
21  Q.   On the same one that had the
22  bushes?
23  A.   No.  It was the one with the

36

1   bare wall.  I believe that was the number
2   I saw.  I was trying to get a number and
3   call to get a unit and get an ambulance
4   there.
5   Q.   You looked for the number?
6   Were you wearing one of these remote
7   radios?
8   A.   I was wearing this radio with
9   a shoulder mike that was attached to my
10  shoulder.
11  Q.   What do they call those
12  exactly?
13  A.   A shoulder mike.
14  Q.   So that gave you access to
15  everybody in the system?
16  A.   It did, only I was on
17  Detective One Channel, which is not picked
18  up by the dispatcher.  The call that I had
19  answered before this I had switched to the
20  detective channel on my hand-held radio
21  and talked to the detective about the
22  other call, so I never switched it back to
23  channel one.  So when I was on the radio

37

1  hollering for help, basically, and giving
2  out a description of him and such, I was
3  on detective one and Detective Nikon, I
4  believe, was relaying that information to
5  detective one as he got it.
6      Q.   So you were able to
7  communicate with other officers?
8      A.   Well, I was on detective one.
9  I never heard him or anything.  At that
10 the point everything was excited I never
11 heard -- I thought I was talking to
12 channel one, until everything was over and
13 during the interview they told me I was on
14 channel two -- I mean on channel eight.
15     Q.   You could communicate with
16 anybody that was just on that channel?
17     A.   Yes.  You can just communicate
18 with the detective channel.
19     Q.   Do you know if any other
20 officers were monitoring that channel?
21     A.   They must have been, because
22 people were showing up.  I'm sure that
23 either they were scanning that channel or

38

1  they heard me or -- of course when Nikon
2  relayed it to channel one, everybody went
3  to detective one trying to hear it,
4  possibly or something -- I don't know.  I
5  don't know who all heard it.
6      Q.   You backed up and viewed the
7  number of one of the residences, and then
8  you called on the microphone to that
9  location, I suppose, or did you?
10     A.   Yes, I did on Detective One.
11     Q.   Then what happened next?
12     A.   I approached him back.  As I
13 got close to him, I noticed that it was
14 pumping blood out of his neck.  I
15 holstered my weapon and got down on my
16 knees real quick and grabbed his neck
17 applying pressure to his neck to keep him
18 from bleeding out.
19     Q.   At any time before you placed
20 pressure on his neck area did you look for
21 a weapon?
22     A.   No.
23     Q.   Did you say anything else to

39

1  him?
2      A.   Yeah, I tried to continue to
3  talk to him.  I was trying to go through a
4  checklist in my brain, so to speak, as
5  surviving injury.  I had been trained on
6  surviving injury through one of my schools
7  that I attended where a trauma surgeon
8  came in and said there is only really
9  three ways to die from trauma:
10 Neurologically, cardiovascular and
11 vascular.  And if he can answer my
12 questions, then neurologically he's fine.
13 If he could talk, he can breathe -- so I
14 tried to keep him talking so he would
15 breathe.  And the only thing I had to
16 worry about at that point was him bleeding
17 out, and that's what I didn't want him to
18 do and I couldn't stop the blood.  That
19 kind of freaked me out there for a little
20 while.
21     Q.   Did you make any comment or
22 reference to him running away from you?
23     A.   Not that I recall.

40

1      Q.   You didn't say anything like
2  you won't have to run -- I won't have to
3  run you down again or anything like that?
4      A.   No.  I was trying to calm him
5  down.  Every time I asked him what did you
6  have in your hand, he would flip out kind
7  of so I said don't worry about it, don't
8  worry about it, everything is all right,
9  and I tried to calm him back down.  I was
10 trying to keep him from bleeding out and I
11 wasn't trying to upset him in any way.
12     Q.   Did any other officers show up
13 at that time?
14     A.   I couple of officers came
15 in -- came into the alleyway and was like
16 moving around, not really knowing -- I was
17 trying to instruct them what to do, I was
18 telling them to get some tape along the
19 alleyway, you know, tape the scene off.
20 And one of them went over to where the
21 bushes were and started going in there.  I
22 said, leave it alone we will let the ETs
23 handle it.  We will let them find the gun,

41

1  don't worry about it, get out of there.
2  Because I didn't want someone saying we
3  threw something down or something like
4  that.
5      Q.   And who is the ET?
6      A.   Evidence technician.
7      Q.   Please don't take for granted
8  I know all of your terms.
9      A.   Crime scene bureau evidence
10 technician.
11     Q.   I just want to --
12     A.   They like to be called CSI
13 now.
14     Q.   Yes, I believe they would.  So
15 you are rendering assistance to him?
16     A.   Yes.
17     Q.   You stayed with Mitchell
18 Bracknell the whole time?
19     A.   Yes.
20     Q.   Until when?
21     A.   Well, I wanted a medic there
22 right then, but it just seemed like it
23 took a long time, which it didn't.  But I

42

1  kept talking to him and holding his neck.
2  The bullet had burned down the side of his
3  neck and it was pumping a lot of blood out
4  here and it appeared to me that he had a
5  through and through, through the neck.
6  Originally I thought he was shot down
7  here, but it must have been the blood or
8  what have you.  I thought he had a through
9  and through and I was holding it, and it
10 was pumping blood through my hand and I
11 couldn't get it to stop.  And I was, you
12 know, he would go listless, and I would
13 kind of wake him up and say hey, hey, hey.
14 And then he would start asking for his
15 wife and he kept saying I forgive you man,
16 I forgive you and stuff like that.
17     Q.   Who said that?
18     A.   Mitchell.  You know, he
19 thought he was dying, you know, I thought
20 he was dying.  You know people do strange
21 things when they are dying.
22     Q.   Did he faint at any time?
23     A.   Well, yeah, he kind of fainted

43

1  in and out and I kept trying to wake him
2  up and I said hold on, hold on, everything
3  will be all right, the medics will be here
4  in a minute, just stay -- if you can stay
5  conscious, from my training, what I was
6  told by a trauma surgeon, if you can hold
7  on and stay conscious and stay fighting,
8  don't give up, if you can get to a good
9  trauma center, which we have here, then
10 you have a 95 percent chance of living.
11 But if you let yourself go, relax, resign
12 yourself to dying or whatever, then you
13 are probably going to die.  And that's why
14 I was trying to coach him in that
15 direction:  Hold on.
16     Q.   To kind of finish up the scene
17 right then, you were holding his chest,
18 talking to him, trying to keep him awake?
19     A.   Holding his neck.  I was
20 applying pressure to both sides of his
21 neck and into the -- the bullet made it
22 look like he was bleeding from his neck,
23 but it went down his neck and hit his

44

1  collar bone right here and lodged
2  somewhere in his back, back there.
3      Q.   So it didn't pass through?
4      A.   The way I understand it, I
5  hadn't read the case file, but from what I
6  understand it's lodged somewhere in his
7  back somewhere.
8      Q.   So to clean up my question:
9  You didn't observe that it had passed
10 through?
11     A.   There was so much blood right
12 here I thought at that time that it was a
13 through and through, through the neck, but
14 it ended up burning his neck and hitting
15 his collar bone here so when I'm applying
16 pressure, yeah, I'm applying pressure
17 holding it, but I'm applying to everything
18 that's there.
19     Q.   What weapon did you use to
20 shoot him?
21     A.   It's the one that I have right
22 now.  It's a Beretta .40-caliber
23 semiautomatic handgun.

45

Q. It's a Beretta .40-caliber?

A. Yes.

Q. What's the magazine capacity of that weapon?

A. Eleven in the magazine, one in the chamber.

Q. Did it surprise you that it didn't pass through?

A. No, not really. I've seen a lot of people shot and sometimes it does, sometimes it don't. Especially when it hits the bone or something like that, then sometimes it fragments or stays in. Lots of times it doesn't -- it's kind of odd -- bullets do crazy things in a body.

Q. What was the distance away from Mr. Bracknell from where you were from the shot?

A. A matter of feet. He was behind a bush that was probably, I'm thinking, three or four feet wide. And I'm, say, two to five feet from that so a matter of a short distance.

46

Q. About ten feet?

A. Less than that.

Q. Less than ten feet?

A. I would think less than that.

Q. You said you thought he had a weapon in his hand, a shiny barrel?

A. Yes.

Q. Please elaborate on that for us.

A. Just what I saw.

Q. It looked like a revolver?

A. It looked like a silver handgun barrel, like a revolver, that's just what it looked like, round barrel.

Q. If you are not an expert, then you are very familiar with all types of weapons?

A. I'm very familiar with weapons. It's just -- it's what I saw. Environmental conditions, I don't know, I went over it a thousand times in my head. And I can tell you what I saw and what I did and that's that.

47

Q. What made you think he may have had a weapon at all? Do you know this guy personally?

A. Just by reputation, and him and his brothers stay in trouble a good bit.

Q. Well, what do you know about his reputation?

A. Burglarizes places, he does a lot of burglaries what from I understand -- gets in little fights and such like that, that you hear him in.

Q. Have you ever heard of him having any deadly weapons?

A. I don't know him that well. I haven't worked any cases close to him. I hadn't known him in any deadly weapon situations. His brother just robbed a Subway and I had a case on him for that.

Q. Do you know what he used to rob the Subway?

A. I think a screwdriver. He robbed his wife actually, another Laotian

48

girl that he was married to that worked at Subway, from what I understand. That's just what I understand.

Q. Is it fair to say you associated Mitchell with his brothers' activities as well?

A. Well, I mean you are asking me what I know about his reputation, that's what I know about his reputation.

Q. Well, does he have a reputation for using any -- I already asked you about deadly weapons and you said you weren't aware of any?

A. Well, a burglary is considered a crime of violence. If you are asking me do I think a burglar can be violent, yes, I think a burglar can be violent and Title 13, it says that it's a violent crime.

Q. Well, I'll agree that it's a crime.

A. And it's a violent crime, according to Title 13.

Q. But a burglary usually

49

1  represents that it's related to some
2  property, is that correct?
3      A.   Burglaries represent anything
4  from a minor property crime to someone
5  walking home and someone burglarizing and
6  surprises them and they kill them, you
7  know -- that happens and it happens a
8  lot.
9      Q.   Do you have any knowledge of
10 Mitchell ever --
11     A.   I don't have any personal
12 knowledge of Mitchell with a weapon, if
13 that's what you are trying to get to.
14     Q.   Well, that was part of it.  Do
15 you have any knowledge of him -- what I
16 associate as a robbery is when something
17 is taken directly from a person.
18     A.   A robbery is a crime of
19 force.  When you take property from
20 another person by force, that's a robbery.
21     Q.   But that's a person?
22     A.   That's a live person.  A
23 burglary is when you take property from a

50

1  residence.  If the person is home at the
2  time, it changes the difference of the
3  degree of burglary and of course if they
4  confront them and end up shooting them or
5  whatever, it changes from a burglary to a
6  robbery at that point of home invasion.
7      Q.   I understand.  But you were
8  knowledgeable about Mitchell Bracknell's
9  activities with other people.
10     A.   Yes, that's correct.
11     Q.   And you said most of that was
12 dealing with some type of property issue.
13 Is that fair to say that?
14     A.   That's fair.  I still wasn't
15 sure what this stabbing/cutting thing was,
16 okay.  That was the main reason I was --
17 used good officer safety, in which I did
18 everything -- in my opinion, through all
19 of my training, I did everything perfect
20 as far as officer safety goes except for
21 the fact that I thought he had a weapon
22 and he didn't have a weapon.  And that's
23 the sum of it.

51

1      Q.   That information that you were
2  given that turned out to be false about
3  the stabbing/cutting?
4      A.   I don't -- I have no idea.
5  It's -- you know at that point I was
6  pulled away from any knowledge of anything
7  else and I didn't get involved in anything
8  else.  So whether ABI went back and
9  tracked that down, I don't know.  I don't
10 know anything else other than that point
11 right there.  It wouldn't be kosher if I
12 went back and was digging around for
13 myself.
14     Q.   I want to follow what you are
15 thinking.  And today that's all we are
16 trying to do is find out what Don Favor
17 was thinking when he started up that
18 alleyway?
19     A.   Way you've got that.
20     Q.   We'll call it an alleyway.  So
21 you felt some sense of danger when you
22 started up that way?
23     A.   Yes, of course I did.

52

1      Q.   In cases like that, wouldn't
2  it have been prudent to get another
3  officer with you?
4      A.   I hadn't found him yet.  If I
5  thought that I had another guy right there
6  I could grab and we were walking together,
7  yeah probably had been better, but it was
8  just a judgment call, just you know, I was
9  checking the back alleys while other
10 people were checking other things.
11 Everybody is one-man units, you know,
12 there were no two-man unit out there, so
13 they are checking other things while I'm
14 checking this.  It's just the way it is.
15     Q.   Is the Chisholm area
16 considered a high-crime area?
17     A.   It can be.  It's kind of a
18 mix.  Further down Chisholm Street and
19 Parkview and back towards Lower Road, it
20 seems to have more crime than the upper
21 part where those townhouses are and where
22 the houses where he was at originally
23 doesn't seem to be as active with crime.

53

1  We have a lot of working people in there.

2      Q.   What district is that?

3      A.   District Four right there.  I

4  think as you cross Coliseum Boulevard,

5  it's five.

6      Q.   Was it the policy at that time

7  that certain parts of town were given

8  two-man units in their patrol?

9      A.   No, now it's not.

10     Q.   Well, how about --

11     A.   Then, no.

12     Q.   So everybody was one-man

13 units?

14     A.   From what I understand, it

15 should have been one-man units that night.

16 We do have a couple of two-man units,

17 usually it's a person who's a trainee

18 riding with someone else.  We try to now

19 at this point put two cars in a district

20 rather than have two persons in a car,

21 that's what they are trying to do.  It

22 doesn't always work out that way.

23 Sometimes you need to put them together,

54

1  but -- there is no written policy on that

2  of any kind.  That's just what they want

3  us to do right now.

4      Q.   After the shooting and you

5  were applying pressure on his neck and the

6  back of his neck or whenever --

7      A.   Just like grabbing him here.

8  Everything that was bleeding, I was trying

9  to hold.

10     Q.   I understand.  After that

11 point, when did the medic unit arrive?

12     A.   I don't know how long it was.

13 It seemed like forever when they got

14 there.  I tried to turn it over to them,

15 they wouldn't let me.  They were like hold

16 on, you hold -- and they were letting me

17 hold pressure and everything while they

18 set all their equipment up, and then after

19 they got all set up, then they switched

20 over.  And you know, I didn't have gloves

21 on and all, they were trying to, of

22 course, glove up and stuff like that.

23     Q.   Did you take any precautions

55

1  or any other type of medical procedure

2  after you had touched Mitchell and his

3  blood?

4      A.   No, I didn't.  I don't know

5  what he's got, if he has any.  I didn't

6  have any open wounds on me.  I just you

7  know at the time I wasn't thinking about

8  whether he had AIDS or hepatitis or

9  anything like that.  If he does, if he'd

10 tell me it would be helpful.  I hadn't

11 since then.

12     Q.   I'm just asking did you go and

13 have any checks of yourself?

14     A.   No.

15     Q.   You didn't do any medical?

16     A.   No, I just washed down with

17 alcohol solution that the medics have.  I

18 had blood up to my elbows and tried to

19 clean up and that was it.

20     Q.   At any time after that event

21 and that night or in the few hours after

22 that, did you go back and have any

23 conversations with Mitchell's wife, "BB"?

56

1      A.   No, I never talked to her

2  after that.  In fact I don't even know if

3  I talked to her then.  I know she was

4  yelling as I was watching her, but I don't

5  know if I ever talked to her.

6      Q.   Are you familiar with any

7  report that came out shortly thereafter

8  that alleged that Mitchell had attacked

9  you?

10     A.   Had attacked me?

11     Q.   Yes.

12     A.   I heard that on the news.  I

13 don't know where that came from, but I

14 heard that on the news.

15     Q.   That was incorrect?

16     A.   That was incorrect.  It was

17 incorrect that somebody said he jumped out

18 of the bushes.  I don't know where the

19 heck that came from.

20     Q.   There was a lot --

21     A.   There was a lot -- I mean the

22 media rarely gets anything correct all the

23 way down to the details because they're

57

1  not privy to a lot of the details, so they
2  embellish a lot -- so I don't know where
3  that came from.
4      Q.   I agree with you that the
5  media probably tries to create news.
6      A.   I have no idea where that came
7  from at this point.
8      Q.   So what did you do after this
9  event for the rest of your shift?
10     A.   Was placed in a detective
11 vehicle by myself separating me from other
12 people and such, which is common
13 practice.  I was escorted to headquarters,
14 I believe it was by Detective Nikon, then
15 went to --
16     Q.   Escorted how?
17     A.   Drove me to headquarters.
18     Q.   You got into somebody else's
19 car?
20     A.   Yes.  They don't let you get
21 back into your car or anything like that.
22 And I was very shaken up at the time, more
23 than I normally thought I would have

58

1  been.  It kind of freaked me out a bit
2  that I couldn't stop the blood and I
3  really thought he was dying, and I didn't
4  want him to die.  And it upset me.  And so
5  I sat there until they got my car and
6  drove me to headquarters, and got to
7  headquarters and I went to the bathroom
8  and washed up good and stuff, and then sat
9  in a room until ABI got there and my PBA
10 lawyer.
11     Q.   Who is that?  Don't tell me
12 what y'all had talked about.
13     A.   No.  Pricilla Duncan.
14     Q.   Now she's a member of PBA?
15     A.   Police Officer Benevolent
16 Association.  It's an organization of
17 police officers can sign up for, which
18 most of them are and whenever you get into
19 a situation where you have ABI involved or
20 you are under investigation for anything
21 or anything like that, then they provide
22 you with a lawyer and they ask you not to
23 say anything until your lawyer gets there

59

1  and that's what happened.  And when they
2  got there, I gave a statement.
3      Q.   Did you ever have any contact
4  with either Mitchell or Mitchell's wife?
5      A.   After that, no.
6      Q.   No contact at all?
7      A.   I heard she came and signed a
8  warrant on him, but that's all I'm hearing
9  in the halls.  You know, I don't have a
10 copy of it.  I suppose I could go get a
11 copy of the warrant or whatever, but I
12 haven't read her warrant or anything like
13 that.
14     Q.   What else did you hear in the
15 hall about that event?  You said you
16 thought she signed a warrant on him or
17 something?
18     A.   Yes.  From what I understand,
19 that someone said that she was dialing 911
20 with her toes, when she was on 911.  And I
21 know that she came to headquarters, from
22 what people said, and signed a warrant on
23 him, but I don't know anything about a

60

1  contents of a warrant.
2      Q.   And you don't know how she got
3  to headquarters?
4      A.   I'm sure someone escorted her
5  to headquarters.  I mean, I can't say for
6  sure but that would be normal procedure,
7  but she could have drove to headquarters.
8  I'm not sure.
9      Q.   You don't have any knowledge
10 of whether she came voluntarily or someone
11 brought her?
12     A.   I don't know.
13     Q.   If you did, it would be
14 hearsay?
15     A.   Yeah, it would be hearsay.
16 It's normal policy when you have a
17 shooting involved, everybody's brought to
18 headquarters and interviewed, so I would
19 think she would have been brought to
20 headquarters.  But they may have said you
21 can drive your car if you would like and
22 follow me down or whatever -- I don't
23 know -- but that would have been normal

61

1 practice.

2    Q.   I'm going to show you a few

3 documents that were provided by your

4 attorney in request for discovery in this

5 case.  Plaintiff's Exhibit No. 1 that was

6 produced.  I will give your attorney time

7 to look it over and look at it yourself

8 and identify it and tell me what it

9 means.

10        (WHEREUPON, a document was

11        marked as Plaintiff's Exhibit

12        No. 1 and is attached to the

13        original transcript.)

14    A.   From what it appears, it's

15 just a page out of the policy and

16 procedure manual the City of Montgomery

17 and the duty in the use of force.  And you

18 want me to read this whole page and

19 explain it to you?

20        MR. MILLS:  Just let him

21 ask you the questions.

22    Q.   (Mr. Hooper)  I don't want you

23 to necessarily read it for the record, but

62

1 give me a summary of what it means to you.

2    A.   Okay.  In Section 2.180 is a

3 duty in the use of force and it states

4 that all police officers in the State of

5 Alabama must be familiar with the use of

6 deadly forces as laid down by the State.

7 The second part of this same section is

8 the force continual, basically.  It goes

9 from verbal direction to empty hand

10 control, mace, tazer or electronic

11 incapacitation device, intermediate

12 weapon, which we have the baton, and

13 lethal weapon which would be considered

14 firearm use.  The second section is 2.182

15 deadly force.  And deadly force may be --

16 this is the city's deadly force policy --

17 deadly force may be used in the defense of

18 life when authorized by the State of

19 Alabama in performance of his lawful duty

20 when all reasonable means have been

21 exhausted.  And the third part there is

22 2.184 duty to report use of force.  And in

23 summary, what it's talking about is if you

63

1 have to use deadly force make sure you

2 tell your immediate supervisor.  And the

3 last part of that is the deputy chief has

4 to be notified.  In this case we don't

5 have a deputy chief, so the chief directly

6 would be notified.

7    Q.   I'm going to show you another

8 page out of that same set of papers that

9 were produced by your attorney in

10 discovery. ·It's not necessarily the next

11 page in the manual, but there is a page.

12 I'm just going to show you this to see if

13 you are familiar with it.  It starts off

14 as a pretty good section on factors to

15 consider in determining whether excessive

16 force was used in citing the Supreme Court

17 of Graham.  Are you familiar with Graham?

18        (WHEREUPON, a document was

19        marked as Plaintiff's Exhibit

20        No. 2 and is attached to the

21        original transcript.)

22    A.   Not at the moment.  I can't

23 think of the Graham versus whoever.  I

64

1 can't cite the case, if you are asking

2 me.

3    Q.   I just wondered if you had

4 heard it in any of your seminars?

5    A.   It escapes me at the moment.

6 What section did this come out of, the

7 policy and procedure manual?

8    Q.   I don't know.  It was

9 produced -- it was in one of my requests

10 for discovery.  And I may have asked for

11 it, but I just wanted to know if you are

12 familiar with what that document means?

13    A.   I haven't -- I don't recall

14 reading this at this moment.  I probably

15 have over the years, if this is in the

16 policy and procedure manual.  I'm not sure

17 if this is in the policy and procedure

18 manual.

19    Q.   Don't assume anything.

20        MR. MILLS:  Hold on.

21 Let's go off for a second.

22              10:00 AM

23        (Off-the-record discussion.)

65

```
                10:01 AM
 1
 2     A.   It lists a wide variety of
 3  things to use deadly force in the --
 4            MR. MILLS:  Wait a minute.
 5  He hasn't asked you a question.  Let him
 6  ask you a question.
 7     Q.   (Mr. Hooper)  Are you familiar
 8  with that document?
 9     A.   No, I'm not familiar with it.
10     Q.   Are you familiar with the
11  contents of that document?
12     A.   No.  Other than just
13  commonsense stuff, yes.  What do I want to
14  ask about?
15     Q.   Are you familiar with what
16  your department's policy is on whether or
17  not the use of excessive force would be
18  used in any situation?
19     A.   Excessive force?
20     Q.   Yes.
21     A.   Deadly force is authorized, if
22  that's what you are asking as you might
23  say right here, and the second point of
```

66

```
 1  this whether a suspect is immediate threat
 2  to the safety of the officer or others.
 3  In other words if I felt that he had a gun
 4  pointed at me, then yes deadly force would
 5  be authorized, if that's what you are
 6  asking.  You don't have to follow the
 7  force continuing of your other page that
 8  you are showing -- just because he points
 9  a gun don't mean that I have to pull out a
10  thing of mace and spray him.  A police
11  officer can always go one above whatever
12  the amount of force the suspect is using.
13  That allows us to -- if not, it's just
14  like the incident we had where the officer
15  got shot through the window.  You know if
16  he would have saw the gun, yes he could
17  have shot him.
18     Q.   Okay, you have answered that
19  question.  In any of your training have
20  you ever been presented the Garner
21  standard for use of excessive force?
22     A.   I've heard of Garner, yes.
23     Q.   I'm going to show you a
```

67

```
 1  document that I've labeled as Plaintiff's
 2  Exhibit No. 3, which was also provided by
 3  your attorney and it's from that same set
 4  of documents that was provided in
 5  discovery.  Does that document explain the
 6  Garner standard to you, Tennessee versus
 7  Garner?
 8            (WHEREUPON, a document was
 9            marked as Plaintiff's Exhibit
10            No. 3 and is attached to the
11            original transcript.)
12     A.   I haven't read it yet.  I can
13  read it and find out.
14     Q.   Well, I'm not asking you to
15  read it.  You have been told that in some
16  of your training?
17     A.   That's correct.
18     Q.   I'm going to expand that
19  Plaintiff's Exhibit No. 3 to include these
20  other two pages, Pages 5 and Page 6 along
21  with the 4 that we have marked.  So it's
22  been widely accepted that the Garner
23  standard is the standard quality use of
```

68

```
 1  deadly force, and I want you to
 2  familiarize yourself with these three
 3  pages and see if you agree that that sets
 4  it out in your training?
 5     A.   Well, I can set here and read
 6  all three pages if you like, but I do
 7  understand the Tennessee versus Garner.  I
 8  have read it before and it is one of the
 9  case laws that is taught in the academy --
10  and as far as standards, it has been
11  upheld or went as far as the Supreme Court
12  I belive it did.
13     Q.   Are you familiar with any of
14  the facts of that particular case?
15     A.   I can sit here and read it if
16  you like, and summarize it a little better
17  for you.
18            MR. MILLS:  Just answer
19  his questions unless he wants you to read
20  it.
21     Q.   (Mr. Hooper)  The question
22  is:  Are you familiar with the Garner
23  standard in your training?
```

69

1    A.   Yes.
2    Q.   Does it depict the standard
3 for use of deadly force?
4    A.   I'm sure that it was taken
5 into consideration when our policy was
6 wrote or what have you, but it's one of
7 the case laws that are taught in the
8 academy.
9         MR. HOOPER:   I'm tendering
10 this as Exhibit 3, those three pages.
11 We've been at it one hour.  Let's take a
12 short break.
13        MR. MILLS:   Okay.
14             10:06 AM
15           (Short break.)
16             10:26 AM
17    Q.   (Mr. Hooper)  The message you
18 got en route to the address on Chisholm
19 was talking about a stabbing and a
20 cutting?
21    A.   That's correct.
22    Q.   And you understood that was --
23    A.   Not over the air, that came

70

1 over the message on the MPT or the
2 computer in the car.
3    Q.   But it was commuted to you by
4 the computer?
5    A.   Yes.
6    Q.   And you found out later that
7 was related to Richard Bracknell?
8    A.   No.  I don't know what that
9 was related to.  By the time I got to the
10 scene, it was never confirmed.  It said
11 Mitchell Bracknell and then it said
12 stabbing/cutting, and then it had Mitchell
13 Bracknell and something else, but that --
14 it had stabbing/cutting there and that's
15 what I was asking the dispatch -- by the
16 time I arrived I was asking her what's the
17 stabbing/cutting that's on there.  I asked
18 was there a stabbing/cutting in progress
19 at this time and she seemed confused.  She
20 was like negative at this time that I know
21 of, but let me check and I was there.
22    Q.   Did that have any effect on
23 your state of mind when you were pursuing

71

1 Mitchell Bracknell?
2    A.   Well, it ups the level of
3 protecting yourself.  I'm not just going
4 to walk up to him and grab him without
5 having him secure or something, if that's
6 what you are asking.
7    Q.   So you never knew exactly
8 whether that was related to Mitchell or
9 not?
10    A.   No, I didn't have it
11 confirmed, but it was just on my MPT.
12    Q.   I know what you are saying
13 there, but I'm still trying to get into
14 what you were thinking at the time.
15    A.   As soon as I arrived and I
16 opened the door my car, it all happened
17 just like that.
18    Q.   But you had notice about
19 something of a stabbing and cutting while
20 you were en route?
21    A.   Yes, I did.  That's why I was
22 trying to get confirmed with the radio.  I
23 was asking her on the way there, but she

72

1 hadn't gotten back with me by the time I
2 got there.
3    Q.   Were you informed of any
4 outstanding warrants for Mitchell
5 Bracknell while you were en route over
6 there?
7    A.   I don't remember.  I don't
8 remember if I was or not.  I don't know if
9 he had any.  I know he had a lot of
10 capeous or something like that later.
11 Someone said the got arrested again for
12 outstanding capeous warrants, which are
13 tickets and fines that he didn't pay.  But
14 he may or may not have had any at that
15 time.
16    Q.   But on your way en route you
17 didn't know of any?
18    A.   I don't remember that.  I
19 don't remember anything mentioned about
20 warrants, but it could have been.  We can
21 go back and check.
22    Q.   No, I just want to know what
23 you remember about what you were thinking.

73

1    A.    I was more concerned with the
2  woman whispering on the phone, and what
3  kind of trouble she was in, and then what
4  the stabbing/cutting business was that was
5  on the screen and, you know, was she
6  stabbed or, you know --
7    Q.    Or someone in the house?
8    A.    Or someone in the house or was
9  he armed or was he not armed.  I didn't
10  know.
11    Q.    Do you know if another officer
12  actually searched the house for any
13  victim?
14    A.    I don't know.  I mean --
15    Q.    But you didn't?
16    A.    I didn't because I was in
17  pursuit of him, and then I ran back to my
18  car and drove off.  Another car was
19  pulling up about that same time, but I
20  don't know if he went around the block,
21  too.  I just don't know.  I know that she
22  ran out of the house.
23    Q.    And you had testified earlier

74

1  that you at least generally knew about
2  Mitchell Bracknell --
3    A.    Generally just by reputation,
4  but other than that, that was it.
5    Q.    Were you ever told that
6  Mitchell Bracknell had just spent six
7  months prior to this event, he had just
8  been detained in the county jail and had
9  been incarcerated 42 days over his time he
10  was supposed to be released?
11    A.    No, I don't know anything
12  about that.  That's bad luck.
13    Q.    Or something else.  In your
14  opinion was this shooting justified?
15    A.    In my opinion, what I
16  perceived at the time it was justified.
17  What in actuality he didn't have a gun so,
18  I mean, he didn't have a gun and I shot
19  him.  You know that's what we have here.
20  What I perceived is that he did have a
21  gun.  And like I said before, as far as
22  officer safety wise and such, I did
23  everything right.  I came too close to

75

1  those bushes without checking that until I
2  was on top of it but, you know, it's just
3  one of those variables that you can't get
4  everything correctly all the time.  But I
5  did it right.  You know after calming down
6  and reviewing it a billion times in your
7  head, I did it right.  I just saw a gun
8  that wasn't there and that's where we
9  stand.
10    Q.    And we stated earlier that you
11  gave no warning before you shot?
12    A.    No, it was just like -- it was
13  just an immediate threat to life and to
14  fire and move and get out of the line of
15  fire before you are dead, and then there
16  we are.
17    Q.    Without actually saying it,
18  we've danced around it some, you actually
19  felt threatened for your life?
20    A.    Yes.  I wouldn't have fired if
21  I didn't feel threatened, if there wasn't
22  an immediate threat to my life, which I
23  perceived at the time.

76

1    Q.    And prior to this you had been
2  given information about a
3  stabbing/cutting?
4    A.    That's correct.
5    Q.    And that was related to in the
6  light of Mitchell Bracknell?
7    A.    It had his name on it, yes and
8  the address.
9    Q.    And he did run away from you
10  at the 649 Chisholm Street address?
11    A.    That's correct.
12    Q.    And he ran away and hid in a
13  bush?
14    A.    Correct.
15    Q.    And you actually found out
16  that it was Mitchell Bracknell after you
17  detained the person?
18    A.    That's correct.
19    Q.    And you were pursuing him for
20  the purpose of detaining him for
21  questioning?
22    A.    At the time to find out what
23  all we had there, yes.  I didn't -- I mean

77

1  when you have a situation like that, as
2  everything is happening you have to stop
3  and detain everybody until you find out,
4  you know, is there a dead person in the
5  house, is this something minor and, you
6  know, whatever.  You just still have to
7  treat everything as the worst until you
8  can find out what's going on, and then if
9  there is no crime committed there and all
10 and he didn't have any warrants on him, he
11 would be released at that point.
12      Q.   Whether it was a no crime, or
13 a misdemeanor, or a felony, you would have
14 acted at the same for any event?
15      A.   I mean, you just have to
16 protect yourself.
17      Q.   So the answer is yes, that you
18 acted the same because you didn't know?
19      A.   Well, I acted on the
20 information that I had.  If I didn't think
21 there was any kind of threat there, then I
22 would be cautious but I wouldn't have my
23 gun out and be prepared for the worst.

78

1  But because I felt that there was a threat
2  there, you know, Mitchell by reputation of
3  being a burglar, the woman was whispering
4  on the phone, the MPT message saying it
5  was a stabbing/cutting, unable to verify
6  that, I had to protect myself is what I
7  felt at that point.
8       Q.   Okay.
9           MR. HOOPER:  I have no
10 further questions at this time.
11
12 EXAMINATION BY MR. MILLS:
13      Q.   Sergeant Favor, did you get
14 any information from any other officers
15 over the road while you were en route to
16 this address?
17      A.   Someone said that they
18 believed that he had an assault warrant
19 out for him, now that you mentioned that.
20 But I don't remember who said that, but
21 yes, someone did come over the air and say
22 something like that.
23      Q.   And that was before you

79

1  arrived at the call?
2       A.   Yes.  Again that wasn't
3  verified either, and that was just one
4  more thing that was over the radio.
5       Q.   And when you heard that over
6  the road, was that given to you in such a
7  way that you felt like whoever gave that
8  was familiar with this potential
9  perpetrator?
10      A.   Someone mentioned his name and
11 said that they believed that he had an
12 assault warrant out for him at this time,
13 but I don't know.  I'd have to go back.
14      Q.   Did that affect your opinion
15 or how you felt in the way you responded
16 to that call?
17      A.   It just added one more
18 variable in it that made me feel that I
19 needed to protect myself.  Yes.
20      Q.   And that night, what division
21 were you working for?
22      A.   At that point I was working
23 second shift patrol.  I was supervisor on

80

1  second shift patrol.
2       Q.   And as a supervisor on second
3  shift patrol, was it your regular duty to
4  respond to these type calls?
5       A.   Yes, to back up units when I'm
6  close to check on them, to make sure
7  everybody is okay and that sort of thing,
8  make sure everybody is doing the job they
9  are supposed to be doing.
10      Q.   Now you weren't actually
11 dispatched on this call, right?
12      A.   I put myself en route to it as
13 a backup unit.  After I heard the call, I
14 told them I was at headquarters and I
15 would back him up.
16      Q.   But you actually arrived
17 before the dispatched unit; is that
18 correct?
19      A.   That's correct.
20      Q.   Was this your area of town?
21      A.   I believe I was riding the
22 west side that night, I would have to
23 check.  District Four is right on the

81

1  borderline of east and west.  It's
2  actually east side district, but Lower
3  Road is west side, and it's just right
4  there on the border of Lower Wetumpka
5  Road.
6      Q.   So when you say west side, we
7  are not talking about Rosa Parks?
8      A.   Well, yeah, west side is like
9  if you are taking the police headquarters
10 you cut the city in half, and that's
11 basically the west side on that side.
12     Q.   I guess what I'm asking is:
13 Did you have to drive very far to get to
14 this call?
15     A.   I was at police headquarters
16 at the time.  It's approximately a mile
17 and a half, two miles, maybe a little more
18 than that two miles, maybe two to three
19 miles.
20     Q.   You've testified a little bit
21 about that you knew Mitchell by reputation
22 and I believe you said that he had a
23 reputation for having committed some

82

1  burglaries.  Is that right?
2      A.   He has a reputation of having
3  erratic behavior, committing burglaries,
4  fussing and fighting and that kind of
5  stuff.
6      Q.   Has it been your experience as
7  a police officer that people with a
8  criminal history are more or less likely
9  to commit violent crimes?
10          MR. HOOPER:  Object to the
11 form.
12     A.   Do I answer that?
13     Q.   (Mr. Mills)  Yes.  He's just
14 preserving an objection.
15     A.   Yes, a person with a more
16 extensive criminal history is usually more
17 prone to violence in my opinion.
18     Q.   When you saw him lying in the
19 bushes, which side was he lying on?  You
20 say he was lying on his side with, I
21 believe, with his back against the wall.
22     A.   That's correct.  He's laying
23 on his right side up on his elbow like

83

1  this, coming around the side of a bush, so
2  that I could see most of his face and most
3  of his body.
4      Q.   And you are propping on the
5  table on your right elbow.  Was he propped
6  up on his elbow?
7      A.   It appeared to me that he was.
8      Q.   In what position was his arm
9  past that elbow?
10     A.   Protruding out.
11     Q.   Towards you?
12     A.   Towards me.
13     Q.   They have attached Plaintiff's
14 Exhibit No. 3 a while ago, it was a three-
15 page document that we had some discussion
16 about.  Do you remember that?
17     A.   It was Tennessee versus Garner
18 are you talking about?
19     Q.   I think that was the subject.
20 Are you familiar with that particular
21 document?
22     A.   I remember going through the
23 case during the academy, and I've heard

84

1  the --
2      Q.   But are you familiar with this
3  actual document?
4      A.   Not that familiar with it
5  other than -- I could read it and it would
6  probably bring back ---
7      Q.   But you don't have any
8  independent knowledge of where that came
9  from?
10     A.   I don't know where this came
11 from.  Attorney Hooper advised that it
12 came from discovery, that's all I
13 understand at this point.
14     Q.   Based on the circumstances as
15 you perceived them just prior to shooting
16 Mitchell Bracknell, did you feel that you
17 had a reasonable suspicion to believe that
18 a crime had been committed?
19     A.   I had a reasonable suspicion
20 that a crime was being committed from this
21 female being distraught and whispering on
22 the phone, and when I arrived she ran out
23 in a tremendously agitated state and

85

1  yelling and screaming don't let him come
2  back. And at that point I felt that she
3  was in fear of her life or for her safety
4  for certain, the way she was acting, she
5  was just jumping up and down and yelling.
6      Q.  Okay.
7          MR. MILLS:  That's all.
8
9  EXAMINATION BY MR. HOOPER:
10     Q.  Mr. Favor, you reviewed that
11 it was dealing with your mind-set about if
12 you believe Mitchell Bracknell had
13 committed a crime.  Do you recall that
14 question?
15     A.  Yes, I do.
16     Q.  Coupled with the message you
17 got on your computer about a
18 stabbing/cutting that also affected your
19 mental state mind at that time?
20     A.  Yes, the message on the
21 computer, yes, of course.
22     Q.  And also you said you received
23 a radio call by someone?

86

1      A.  Someone had -- just prior to
2  me getting there and I don't know who got
3  on there, you know, I was en route and
4  once they put out Mitchell Bracknell's
5  name over the air someone, you know, keyed
6  up and said I believe that subject has got
7  a 77 for assault at this time, which 77 is
8  a felony for assault.
9      Q.  And that person would have
10 been a police officer?
11     A.  Yes.  He gave -- it was a unit
12 number, and I don't remember which unit
13 number it was at this time.
14     Q.  Did you ever ascertain if
15 there were actually warrants out for him
16 at that time?
17     A.  No, I mean, everything was
18 happening right boom, boom, boom -- I was
19 there and nothing is verified at this
20 point, and then she runs out the front
21 door and everything's on.  And that's it.
22 It's just the nature of it sometimes, you
23 know, everything is happening at once.

87

1      Q.  And you never ascertained
2  whether or not Richard Bracknell was
3  related to Mitchell?
4      A.  From what I understand they
5  are brothers.  If they are not, that's
6  just what I understand it.  It was
7  Michael, Mitchell and Richard, and Michael
8  died in a car wreck I think about a year
9  ago and Mitchell, of course, is here.  And
10 the brother that he had had that trouble
11 where he had tried to get Subway's money
12 from his wife and she wouldn't give it,
13 and then finally he robbed her with a
14 screwdriver or something over there on
15 Dalraida Road.  That's about what I know
16 from the family.
17     Q.  So all those factors combined
18 painted a pretty bleak picture of
19 Mr. Bracknell sitting here today?
20     A.  I knew his uncle.  I believe
21 it's his uncle, Richard, I went to high
22 school with him.  And he was a friend, but
23 he would fight at the drop of a hat.

88

1      Q.  So is that the Richard that
2  you assumed --
3      A.  I don't know what his relation
4  is, but they came from the same part of
5  Highland Gardens -- Ricky Bracknell,
6  excuse me, Ricky Bracknell and I don't
7  know what his -- and other than that, I
8  don't know anything else about the family.
9      Q.  Have you told us everything
10 that you said to Mitchell Bracknell that
11 night as you were pursuing, looking for
12 him up until the time you released him to
13 the medics?
14     A.  As I understand it -- as I
15 remember it I was pretty upset when I was
16 trying to stop the bleeding and he would
17 start acting up or something and I would
18 try to calm him out of it -- I don't know
19 what all I said to calm him.  I know that
20 I was talking -- we are going to call your
21 wife, don't worry about it.  He was really
22 wanting to talk to his wife.  And he'd say
23 I forgive you and stuff like that.  He was

89

1  saying a lot of things and I was trying to
2  keep him calm.  You know, if I said
3  something else, I don't know, but I didn't
4  make any...
5      Q.   Did you identify who he was
6  talking about when he said I forgive you?
7      A.   He was talking to me, because
8  me and him were the only ones there at the
9  time.  But I don't know -- I mean he
10  thought he was dying.  I really believe he
11  thought he was dying.  And I thought he
12  was dying.  He was upset.  You know that's
13  the way it is.
14      Q.   We've said it about twice
15  already, but it was your purpose there to
16  detain him or arrest him?
17      A.   Yeah, he needed to be stopped
18  at that point to find out what all was
19  going on.
20      Q.   And you knew of his reputation
21  generally, but that did not include the
22  use of a deadly weapon and a commission of
23  a crime; is that correct?

90

1      A.   Other than the statements on
2  the MPT saying it was stabbing/cutting and
3  someone saying that he had a felony
4  assault on him.  You know that just built
5  with what I needed to do to protect
6  myself, and I really feel that I did do
7  the right thing, up to the point where he
8  didn't have a gun.
9      Q.   Of course we only know what
10  happened, was there anything -- would you
11  have conducted yourself differently if you
12  had one of these other reports of warrant
13  communication and the message on your
14  computer and about the stabbing/cutting
15  and, of course, the Richard that was
16  referred to, is not his brother but
17  that's -- I'm asserting that to you --
18      A.   Okay, well I understood it to
19  be his brother --
20      Q.   And you already said you
21  didn't know exactly the reputation?
22      A.   No, I understood that there
23  was three brothers.

91

1      Q.   Would you have conducted
2  yourself any differently?
3      A.   Knowing that Richard wasn't
4  his brother?
5      Q.   And the message -- I'm asking
6  a hypothetical and I don't like it when
7  somebody asks that to me --
8      A.   You are asking a hypothetical
9  I mean, you can Monday-Morning quarterback
10  it -- it's all easy to -- when you have
11  all the facts laid out in front of you and
12  months to the prepare what you want to
13  say, it's easier to do than to say that --
14  all of this happened in a matter of
15  minutes and I did what I was supposed to
16  do with the information given to me at the
17  time.  It just -- he simply didn't have a
18  gun and that's -- that's just the way it
19  is.
20      Q.   But the message on the
21  computer, message over the radio about the
22  assault, and the woman at the scene acting
23  hysterical, all of that played a big part

92

1  in the way you protected yourself; is that
2  correct?
3      A.   That is correct.
4      Q.   Okay.
5          MR. HOOPER:  No further
6  questions.
7          MR. MILLS:  That's all.
8          ***************
9          10:46 AM
10          FURTHER DEPONENT SAITH NOT
11
12
13
14
15
16
17
18
19
20
21
22
23